MARY A. MITCHELL, administratrix, *vs.* NATHAN
SILVERSTEIN
(and a companion case [1]).

Suffolk. October 11, 1946. — December 4, 1946.

Present: FIELD, C.J., DOLAN, RONAN, WILKINS, & SPALDING, JJ.

*Negligence, Motor vehicle.*

Evidence of the extent and nature of damage caused to an automobile by a collision with a pedestrian on a wide street in the darkness of an early February morning under war "dim out" conditions, and of the position and the extent of blood stains and fresh human tissue on the front of the automobile would have warranted a finding that the pedestrian was struck while standing or moving and that his resulting death was caused by negligence of the operator of the automobile.

TWO ACTIONS OF TORT. Writs in the Superior Court dated September 3, 1943.

The cases were tried before *Williams*, J.

In this court the cases were submitted on briefs.

*E. F. Cooley*, for the plaintiff.

*M. T. Prendergast*, for the defendants.

WILKINS, J. These are two actions of tort, one against the owner, and the other against the operator, of an auto-

---

[1] The companion case is by the same plaintiff against William Sherman.

mobile, to recover for the death of the plaintiff's intestate by reason of being struck by the automobile, which was allegedly operated in a negligent manner. The only question argued is whether there was error in the direction of verdicts for the defendants.

We summarize the facts which the jury could have found upon the evidence, which came entirely from witnesses called by the plaintiff. The only eyewitness to the actual striking of the deceased was the defendant Sherman (hereinafter called the defendant). He did not testify, but two statements of his, one to an inspector for the registry of motor vehicles, and one to a police officer, were received in evidence.

On February 20, 1943, about 6 A.M. the defendant, an employee of the defendant Silverstein, was driving a taxicab and "riding on the rails" "in the car tracks" and proceeding in a southerly direction on Tremont Street, Boston, between Rutland Street and Concord Square. Tremont Street is seventy feet wide and contains two sets of car tracks, which occupy a width of fifteen feet nearly in the center of the street. The weather was clear and the street damp. It was dark and during the wartime "dim out," and there were two arc lights at the corner of Tremont Street and Concord Square, which gave forth an uncertain amount of light. There was no other moving traffic. The defendant's headlights were "on full beam." His speed was between twenty and twenty-eight miles per hour. About fifty feet before reaching Concord Square and "right close to the right outbound track" the defendant struck the deceased. The outside car rail was either twenty-four or thirty-one feet from the curb. After the defendant stopped, the body of the deceased (who was pronounced dead upon arrival at the hospital at 6:30 A.M.) was found lying under the front of the automobile, with the head and shoulders showing. The defendant in his statements said that he had seen a man lying in the street about ten feet in front of his automobile to the right of the car tracks, and that he had not had time to turn either way and had put on his brakes hard and stopped. A bystander "noticed

bleeding and blood moving along the tracks and that it wasn't there [at] first.".

Human blood stains were on the front bumper of the automobile and on a fog light mounted on the left bumper bracket. Spotted stains were on the left front mudguard. The lens on the right headlight was loose, twisted about twenty-five degrees, and dropped one inch out of place. The fog light was loose and bent slightly to the left, the lens showing a cracked chip, over which dirt had been brushed off for about three quarters of an inch. The right vertical part of the flange retaining the lens showed stains, and on the lower portion there was a place where the dirt had been brushed off. There were a number of small spots on the upper half of the lens. The left bumper guard (a vertical cross piece) was twisted to the left at the bottom and to the right at the top. Directly in line with the left bumper bracket, there was a group of human blood stains on the face of the bumper with small spots and streaks radiating from this point and extending along the bumper as far as six inches from the left end and as far as two inches from the center. On the fender behind the bumper "in the area limited by the hood and the head lamp" were scattered small blood spots, many showing a direction from the right side of the fog light. Along the right side of the rubber cover at the base of the bumper bracket on the fender, which was bent in at that point, were small fragments of fresh human tissue in an area extending downward and across a width of one and one quarter inches and ending with a wet spot on one prong of a bracket, which in the shape of an inverted metal trough held the tie rod of the steering gear. There was a mark on the coat of the deceased "resembling" that trough. The highest point on the automobile where there were stains was twenty-seven inches above the ground. Other measurements above the ground were: the human tissue on the bracket of the fender, eleven and three quarters inches; the tie rod holding the bumper, twelve and one quarter inches; the bend in the fender, thirteen and one half inches; the lower edge of the bumper, thirteen and one half inches; and the stains

on the fog light, twenty-one to twenty-three inches. The bumper was four and one quarter inches wide.

The cause of death was a crushing of the skull across the base extending on and producing crushing of the bone above the carotid artery. There was a tearing of both carotid arteries, as well as a rupture of both ear drums, and the deceased bled to death through the ears. There were abrasions about the right knee, over the left lower leg, over the lateral surface of the left chest, over the lower ribs, and on the back of the head. There was a right-angle laceration over the back of the left thigh.

The defendants concede that there was evidence which would warrant a finding that the automobile "ran upon" the deceased, causing the injuries which resulted in his death. They rely upon the well-known rule that the mere happening of an accident upon the highway is no evidence of negligence on the part of the operator of a motor vehicle. *Rizzittelli* v. *Vestine,* 246 Mass. 391. *Whalen* v. *Mutrie,* 247 Mass. 316. But there is more than the mere happening of an accident here. The jury were not required to believe the defendant's statement that the deceased was lying in the street when struck. *Snow* v. *Nickerson,* 304 Mass. 63, 65. On the contrary, in view of the amount and location of the numerous items of damage to the automobile, we think that the jury might have found that the deceased was standing or moving when the defendant ran into him. There was damage to the headlight on the right and to the fog light on the left. There was blood as high as twenty-seven inches above the ground. The case is close, but we are of the opinion that the jury could have found that it was negligence on the part of the defendant to drive on Tremont Street in the darkness of an early February morning under dim out conditions at a rate of speed which prevented his seeing the deceased in time to avoid striking him either by stopping or by changing direction, and that such negligence was causally related to the accident. *Walsh* v. *Gillis,* 276 Mass. 93, 96–97. *Conrad* v. *Mazman,* 287 Mass. 229, 233–234. *Wright* v. *Carlson,* 312 Mass. 584, 588–589. *Campbell* v. *Ashler, ante,* 475, 478.

*Exceptions sustained.*